Our next case this morning is 24-5030 United States v. Summers and Ms. Kimmelman, you may proceed. May it please the court, counsel, Kristen Kimmelman for Johnny Lee Summers. Mr. Summers asked the court to reverse his convictions and remand for a new trial because in his trial that was based on conduct that occurred in 2021, the judge allowed under Rule 404B other act evidence that occurred three years earlier in 2018 with different minors. And the court held that this other act evidence was relevant to identity, plan, motive, and intent. And because of that broad ruling, the trial judge, who was different than the judge who presided over the pretrial conference, let in the evidence and understood that it was relevant to those four purposes and also instructed the jury that it could consider it for all of those four different ones. And all four were disputed? All four were disputed and we dispute them on appeal. That was an abuse of discretion because they were not relevant to a permissible purpose. Now, I've divided the government's arguments into basically two groups, one about whether there was a signature quality or modus operandi, and the other about whether the evidence was relevant because it tended to show he had a sexual interest in children. Now, taking the signature quality evidence first, the government says, you know, Mr. Summers had an MO of using an older sister to gain access to a similar, to a younger sister. They don't actually have proof that that was his purpose in starting those relationships. And there are also key differences between the different relationships. And there's no distinct or unique signature quality. So in 2018, the evidence shows that Mr. Summers was communicating with the older sister. Mr. Summers was 18 and the older sister was 16 and was asking the younger sister for nude pictures of herself and also of her 10-year-old sister. And he also asked them to commit sexual acts together that he watched over video chat. There was no sexual contact, but there was intense involvement by that older sister. In 2021, when Mr. Summers is 21, he's dating a different person, Navi Hogue, who's 17. And at some point during their relationship, he starts communicating secretly with the younger sister, who's 14, J.H. He's sending messages through Snapchat directly to J.H., asking, sending her nude pics of himself, asking her for nude pictures, which I don't think she actually sends, and asking her to basically acquiesce in sexual acts with him, all behind the older sister's back. And that's actually how the government starts its closing argument. Don't tell Navi. Will you promise not to tell Navi? Referring back to messages that the government says that Mr. Summers sent to J.H. So those are very different qualities in those two different events. And the similarities between them are common. Snapchat, you know, the younger generation uses Snapchat. And unfortunately, there is a prevalence of sexting and using those messages to entice the younger people to engage in these sordid sexual acts or things they're just not old enough to do yet. And then when the person is caught, either with, you know, child pornography or these messages that suggest coercion, the defendants often claim, I was hacked. That wasn't me. It wasn't my account. I don't know who sent those messages. I don't know how those pictures got onto my computer or phone, whatever it is. It's very common. It's like the street-level drug dealer who gets, you know, sees that the cops are coming and decides to throw away the drugs or the gun and run off. That's a common thing. Well, it may be very common, but it's still something in dispute that the jury has to decide, that the jury needs evidence for to decide. You can't just say it's common and so therefore everybody knows it's a lie or something. No, it's not that it's common so it's a lie. It's that it's common so it doesn't fit into the line of cases requiring, that allow signature-quality evidence to be proof of identity. And so other instances of that common street-level drug dealer running away from the cops wouldn't be admissible just to show, well, he ran away then, he ran away now. Here, the identity was the disputed thing for the messages. Why isn't it enough? I mean, you're requiring the same lettering for every digit or letter of his name, the M's be exactly the same, but isn't it a bigger question on signature, that is this the sort of person who uses an older sister to get to a younger sister if he has an opportunity? Signature, and there's his name. Except in 2021 he didn't use the older sister to get to the younger sister. Well, he knew that there was a younger sister. That may have been how they met. And the older sister saw them in the bathroom and so he got to the younger sister just because he didn't. Maybe in one instance he realizes the older sister is going to resist that and in the other instance he thinks she'll go along with it. But that doesn't mean it's not the same fellow trying to commit the same crimes, a.k.a. a good enough signature. I suppose if there was more proof that that was his purpose in starting the relationship with the older sister, but we don't have any evidence like that. We have some proof, which is what happened. That's the circumstantial proof, you know, a man dates a sister and then gets interested in the younger sister. You know, that is another common occurrence. This is not like the other signature cases where it's the same car that's used in the different drug transactions that's registered to the defendant or the excavator who goes to the same archaeological dig to excavate remains there. These are run-of-the-mill, unfortunately, coercion. And the court let in the more sordid, unusual aspect of that 2018 occurrence, which was what the messages were asking the girls to do, which was to touch each other, kissing each other's pussy. That was not conduct that was from the 2021. And even though the government says it's not salacious or, you know, it is of a different character, and that certainly is something those details would have colored the jury's mind in such that it's hard to put out that information when looking at the evidence in front of it, of whether Mr. Summers committed the acts that were actually charged there. Didn't he also ask in the 2021, in the incident that's the subject of this case, didn't he also ask the younger sister if she wanted to engage in a relationship with he and the older sister at one point? Well, he did. There's a message where he's saying you can join our relationship. Right. Because I think the younger sister was hesitant to do something that might upset the older sister. They, of course, never did that. And there's no evidence that the older sister knew about those messages. She actually testified that she didn't know they were messaging each other. And even though she saw the incident in the bathroom, she said she didn't see exactly what happened between them. Now, turning to the propensity evidence, that the government wants to use this prior 2018 instance to say Mr. Summers has a sexual interest in children, so it's relevant to prove motive and intent. That runs in face of this court's precedent in Comanche that requires to be admissible, the evidence to be free of propensity-based reasoning, chain of reasoning. And so the jury can't have to first conclude, well, Mr. Summers had a sexual interest in children back then, so he acted on that same interest now. Comanche was different. In that case, there was, you know, the evidence didn't shed any light on the only disputed issue, which was self-defense. That's distinct. That's not what we have here. Well, in Comanche, the evidence was being used to prove that he was a violent person. And so here, the evidence is being used to prove that he is a sexual predator. And the government referred to that in their opening, that the jury was going to hear about repeated instances of sexual contact with minors. And then in the closing, uses again that 2018 evidence to make Mr. Summers out to be a liar. No, he disclaimed. He disclaimed essentially any motive. He disclaimed sexual interest in J.H., the child. He said she was the instigator. He claimed he was hacked. He denied all this. Correct. He puts this at issue. So definitely his intent and whether he was the person sending the messages were at issue. The question is whether those prior act evidence, because it weighs on the propensity to have a sexual interest in children, is admissible for a permissible purpose under the rule. And so we maintain that these are not substantially similar acts, three-year difference, different details and M.O.s and, you know, using the other sister versus just secretly communicating with the younger sister separate from the older. That makes it impermissible to introduce that evidence here. And even if the court- Well, he has a prior, clearly based on the 2018 interest, he has a prior interest in a very young child, a 10-year-old girl. And that is very persuasive evidence that can color the jury's mind to not look at what 2021 is. But it can certainly also go to counter his disclaimer, essentially, that he had no sexual interest in J.H. as a child. She instigated it, that he was hacked. All denials. So even if the court thinks that this evidence is relevant in some degree, it certainly was not all of it. We have three witnesses testifying in detail about what occurred. You have the exhibits from the government, 18 and 19, which are pictures of those sorted text messages. And then you have the 30-minute video or audio interrogation of Mr. Summers from back in 2018. So the jury hears all of this without any sort of guardrails or limits. Well, didn't he, during that interrogation, make a lot of the same denials that he made here, as well as some admissions that he made here that he later denied? Correct. Wasn't it important for the jury to see that, the pattern? It was important for the jury to know that he claimed to be hacked, if we're going to accept that that's a permissible purpose. It's important for the jury to know that he sent sexual, you know, that he asked for these nude pictures from the girls. He didn't need to know that he, the jury didn't need to know that he asked for the girls to touch each other sexually while he was watching over video. I don't think that adds proof that could be relevant to this. So they certainly didn't need to hear the entire 30-minute interrogation, and they didn't need to have the older sister going through the details of some of those communications or have the pictures of it. And now the Judge Frizzell, who presided over the pretrial conference, recognized that there was prejudice in this, and that there would need to be limits to make sure that any probative, that that's not overly, unduly prejudicial. But that sort of, in my view, got lost in communication when the case was transferred to the Judge Melgren for the actual trial. And so that's how this happened, that everything came in. And I would say because of that limiting instruction that allows the jury to consider for all four purposes, if this court finds that any of those were not permissible or that there were not the proper guardrails of keeping out the pictures of the messages, limiting the testimony, redacting the audio interrogation, then it needs to go back to the trial court, at least for the court to make that 403 ruling explicit. What about harmlessness? It's not as though there weren't a lot of evidence about J.H. Right. There was a lot of evidence from J.H.'s testimony and from the Snapchat messages. And the sister? The sister was a favorable witness for Mr. Summers. Well, the sister recounted the bathroom episode. Which she didn't see exactly what happened. Well, pants down.  But she also said J.H. is a liar and that she had a motive to smear Mr. Summers. She saw what she saw. She said what she said she saw. And what she said she saw was a lot. And Mr. Summers was acquitted of the counts that involved Navi, which also had a lot of evidence. I'm talking about J.H., though, and what her testimony was about J.H. And just wondering, the government, of course, is going to say no error. And if there were error, it was harmless. And I'm just asking your response to why isn't it harmless. It's not harmless because they heard very sordid details that had no relevance to the charges that he was facing based on that 2021 convict. And Comanche says, even if you can admit the prior felony conviction, admitting those details make it more likely that the jury is committing him for a past crime, not for the current crime that he is facing the charges for. So it was extremely prejudicial. The jury couldn't escape that clear articulation that he was a sexual predator who needed to be put away because of what he had done back in 2018. Well, the 2018 charges were not what he was facing. He was needed to be convicted if he was going to be convicted only based on what happened in 2021. But you said some of the 2018 could have come in. The fact of the prior conviction, use of a computer, that's what the jury could have known, that he was convicted of use of computer. Instead, they heard that he did all of these awful things, if I may finish my sentence, and that he's did something very similar, not unique and distinct, but similar three years later. So the jury needed to take the law in their own hands. That's the harm. Thank you. Thank you, counsel. Let's hear from the government. May it please the court. Stephen Bryden on behalf of the United States. If I could, I'd like to start right where my colleague just left off. The idea that the right solution here was to simply put in the fact of a prior conviction, and not getting into any of the details, flies in the face of 404B and what it's trying to accomplish. The government's evidence here showed that because Mr. Summers had repeatedly and extensively put his identification or the identification of the culprit at issue, the government needed to do something more than just say it was Mr. Summers. The government needed to prove that it was Mr. Summers. And you can't do that by simply stating the title of a prior conviction. And that's where this court's case law and identity comes from. And as Judge Phillips, I think, discussed a lot at the beginning of my friend's argument, the case law is not so strict as Mr. Summers presents it on how similar or like exactly similar things need to be in order to be considered enough for a signature quality. One thing that wasn't discussed was not only the way that he interacted with the girls, very similar between the two offenses, the way that he acted afterwards is extraordinarily similar. And it's not just saying that his Snapchats were hacked. It's in both of these interviews, he admits at first to some of this conduct. He admits to some of these messages until he gets to something that's compromising. And then he pulls back and says, actually, I'm hacked. These things aren't me. And I'm probably hacked by the girl's father. Both different times he starts with the same thing. He's known to do these type of things. It's probably him. And then he backs up, you know, even further. And by the time of trial, he didn't say anything. He didn't do anything, according to his testimony, which even further called that identity into question. And this court certainly found in Gutierrez, in a situation of a bank robbery, not only was part of the determination of signature quality that this was a husband and wife bank robbing pair. You know, the husband goes in and he commits the bank robbery. But what they found was a signature quality was that the wife was the getaway driver in both cases. And that during the getaway, she had kids in the cars, this kind of cover. And so that's not necessarily an element of the offense. That's not a part of proving up the crime itself. But it's part of the way that the defendants in that case chose to try to cover up the crime that went into that signature quality. And that's present here both, as I said, in the crime itself and in Mr. Summers' attempts to cover up the crime. Well, can you address the particular concern that counsel has expressed, and justifiably so, that the nature of the 2018 messages that were entirely introduced, some of those would have been highly prejudicial and weren't necessarily similar to the 2021 offense. And in particular, the request that the sisters engage in this sexual conduct together. There was nothing like that in the 2021 offense. It hadn't gone to anything quite that level in the 2021 offense. It's a whole other level, and that came in. Well, in that I just mean. And why isn't that highly prejudicial such that, at a minimum, there should have been a balancing test at that point? Because what we have from the messages from 2019 is simply a request. And this Court's case law has been relatively consistent that hands-on sexual offenses, actual proof of sexual conduct, is the most prejudicial of that nature of that type of evidence. And so while the solicitation of that type of conduct is no doubt prejudicial in a sense that it puts the defendant in a bad steed, it's not necessarily so much more prejudicial than what we had in this case, which was 11 months of extraordinarily sexual communications with a minor and including, you know, acts straight up to penetrative vaginal sex with the minor child. And so any prior act in a child sex abuse case that involves child sex abuse is going to have an amount of prejudice to it. But simply because the nature of it is different doesn't necessarily mean it's so much more prejudicial that it can't come in. Was there ever any discussion or attempt to limit the evidence that came in on the 2018 activity? Was there ever any discussion with Judge Milgren about that? Because Judge Frizzell did indicate that there should be some consideration of limiting the evidence that would come in. Yes, Your Honor. But that never happened, did it? So I think it's important to actually look at what Judge Frizzell said. And so when he's talking about those limitations, he is talking about that it would be inappropriate for the government to bring any photos or videos of the children, right? I mean, he's not saying you can't bring in the topics of these text messages. That's what the government was asking to bring in under 404B. You know, everything the government presented at trial was in its 404B notices, what it intended to offer. And then Judge Frizzell also stated that it would be, it's important that the evidence presented is limited to the four purposes that he's already found are admissible. Well, that's what he did as a part of that order. If there were things in there that were outside the scope, he would have limited them at that point. Now, defense, certainly in response to Judge Milgren's, excuse me, Judge Frizzell's order, could have made specific objections during the presentation of that testimony, arguing that it had gone outside of the scope that Judge Frizzell had earlier approved, but they didn't do so. There were no objections like that?  Well, so it may be a little tough to tell this from the timeline of the case, but it is in the pretrial order. So this hearing with Judge Frizzell happened the morning of trial.  And then Judge Milgren, there was a conversation about the scope of that order right away that was more or less due to some miscommunication between the two judges. But once that, you know, ultimately that confusion was clarified, Judge Frizzell only had time to make an oral order because it was simply a few hours later. So once he was able to get a full synopsis of that order, there was no, to my knowledge of the record, specific objection saying, okay, but this thing that the government wants to ask about or this part of the recording that the government wants to play is beyond the scope of what Judge Frizzell had authorized already. And then the limiting instruction that Judge Milgren ultimately gives reinforces that limitation from Judge Frizzell's order, making it clear that those are the only four purposes for which the evidence can be admitted and that the jury is not free to use that for any other purpose. The government did not make any arguments that were propensity arguments. We never argued to the jury that they should find this because of what had happened in 2019. Did the defense object to the limiting instruction that was proposed by the district court? I don't think so, Judge. If they did, I don't remember. There were a few other points from the reply brief that I just wanted to address briefly. It's brought up a lot about the fact that three years is allegedly a long time prior for 404B evidence, and that's one of the reasons why this court should overturn the decision. Just, you know, a brief look through some of the case law that's in the government's brief, but not necessarily talked about on this point. The Shumway case, which has come up frequently, in that case, the act was seven years prior to the charged offense, and they specifically said, there's no absolute rule regarding the number of years that can separate offenses. Rather, the court applies a reasonableness standard and examines the fact and circumstances of each case. The Engelman case, it was 13 years separating conduct. So there's no bright line. If there is a line at which things become too stale to be used, it seems difficult to imagine that three years in this case would be so far removed that it no longer has that value. Also, one thing to address what my colleague had said about Comanche and just the way to look at this evidence generally. 404B evidence is not prohibited if it has any, if there's any interpretation of it that may lead to a propensity inference. In fact, it's the opposite. In Mason, this court said when other act evidence is admitted for a proper purpose and is relevant, it may be admissible even though it has the potential impermissible side effect of allowing the jury to infer criminal propensity. And here, because there were four established proper purposes, even if you could pose this evidence in a way that it would serve a propensity inference, number one, it's not what the government did in this case. And number two, that's not, would not necessarily mean the evidence was improperly admitted. Again, shouldn't there have been some type of 403 balancing discussion by the district court? So the district court stated that it considered 403 in its oral ruling. Which judge? This would be Judge Frizzell in the oral ruling. I agree he doesn't go into a tremendous depth about it, but in saying the types of things that he believed would need to be limited in order to comply with 403, I think that gives this court enough information to recognize that he did, in fact, consider whether this evidence would be more unduly prejudicial than probative, and then ruled accordingly. It's not like he said nothing about 403 and said nothing about limiting principles. He just wasn't particularly verbose in how he went through it. What about harmlessness? So, Your Honor, in this case, I think the harmlessness argument is very strong on behalf of the government. Looking at the evidence, you know, completely excising anything from the prior case, the government had over 3,000 Snapchat messages between the defendant and the victim. While there is kind of this attempt to downplay the nature of the evidence and portray it as a he said, she said, as you discussed earlier, that's not really the case. Nady Hogue, who was not particularly favorable to the government during trial, admits, yes, there was a time that I came into the bathroom and her pants were down and he looked like he had just pulled up his pants, which matched with what J.H. testified to in the case, which also matched to what Mr. Summers had said to some extent in his interview with the police, which was played where he said, I was in the bathroom with her, yes, but we were in there and we were talking about video games. But then by the time he gets to trial, he was never even in the bathroom with her in the first place. So when you're looking at, you know, what you can infer from this testimony, you have a jury being able to consider, well, maybe his admission that he was there in the first place, you know, and then both sisters saying that he was there and describing what he was doing. You know, and then the Snapchat messages themselves, there's not just like 20 Snapchat messages that talk about particular sexual requests. Like I said, it was 3,000 pages, thousands of messages, thousands of messages. And they were also like mundane aspects of their life. It was, you know, asking her if she'd come over to the hotel, talking about what they ate for dinner, what they did last night, these life offense that we identified that the district court kind of relied on in its sentencing argument that, you know, he takes a picture of his hand, it gets cut in an accident, he sends it out, they're all in the messages. Well, he's in court, he's like, yes, I admit I got my hand cut, I admit I took those pictures, but I only sent them to my mom, so it couldn't possibly be me. It must be the hacker again. Or, you know, a conversation between he and J.H. talking about how far along his fiancee at that point's pregnancy is. What's the standard? You have a quantum of evidence, and I appreciate your reviewing through it. Sure. But at the end of the day, what is the standard? You say, we have this much evidence, and because it's non-constitutional error, blank. Well, I think when you're talking about ‑‑ I guess I don't have a great answer to what you mean by a standard. So, I mean, there's obviously the harmless error standard, and it's very effective. What do you have to show? First, it's your burden, right? Sure. We have to show that, you know, they would have convicted him regardless of the fact that this evidence that was brought in was inappropriate, that that doesn't cause any concern. By a preponderance or by something more? It would be by a ‑‑ I'm sorry, Your Honor, I know the exact wording is in my brief. I believe that the court has to be convinced that the evidence, if it was improperly admitted, was not such that it affected the outcome of the case. And so I think that would be clear and convincing. But I stand on what I've written in my brief in case I have misstated that here. But the evidence here goes, you know, much beyond that. In fact, there's ‑‑ I've cited in the brief about when the evidence is overwhelming. It's pretty much always going to be a harmless error. And in a case like this, it's tough to find a situation where the evidence would be much more overwhelming because of the way that all the evidence intertwines with itself and because of how incredible both the jury and the judge made a point of saying that Mr. Summers' testimony was. And yet, here comes the Miller evidence. Which, you know, I agree. I understand, Your Honor, that that evidence could have weight. But I think it's important to note that this evidence didn't permeate the trial like has been presented. While there were three witnesses that presented evidence on the Millers, they took up the same time as one‑third of just the primary victim's testimony. This was a ‑‑ I see that I'm out of time, Your Honor. Go ahead and finish. Sorry, I didn't understand what she said. So this was one piece of one day's trial in a trial that I believe was four and a half or five days long. It did not factor significantly into the government's closing argument. It was a few sentences total. And it didn't factor at all into the government's opening argument. And so while the evidence was important, that's the reason we put forward the 404B, there was a significant amount of evidence presented in the case that had absolutely nothing to do with the Millers. And that evidence alone shows that the defendant was guilty in this case. And we would ask that this court affirm. Thank you, counsel. Counsel are excused and the case is submitted.